***UNITED STATES DISTRICT COURT***
***DISTRICT OF MAINE***

| | | |
|---|---|---|
| ***MEREDITH BILLINGS,*** | ) | |
| | ) | |
| ***Plaintiff*** | ) | |
| | ) | |
| ***v.*** | ) | ***Civil No. 09-183-B-W*** |
| | ) | |
| ***MICHAEL J. ASTRUE,*** | ) | |
| ***Commissioner of Social Security,*** | ) | |
| | ) | |
| ***Defendant*** | ) | |

## *REPORT AND RECOMMENDED DECISION*[1]

This Social Security Disability ("SSD") appeal raises the question of whether substantial evidence supports the commissioner's determination that the plaintiff became disabled on August 20, 2003, well after the expiration of her date last insured for purposes of SSD benefits, December 31, 2001. I recommend that the decision of the commissioner be vacated and the case remanded for further proceedings.

In accordance with the commissioner's sequential evaluation process, 20 C.F.R. § 404.1520; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff was insured for purposes of SSD benefits on June 1, 2001, her amended date of onset of disability, and continued to be insured only through December 31, 2001, Finding 1, Record at 26; that she had severe impairments, including an anxiety disorder with agoraphobia, a history of post-traumatic stress

[1] This action is properly brought under 42 U.S.C. § 405(g). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on December 17, 2009, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

disorder, and cardiomyopathy, as well as non-severe impairments including possible fibromyalgia, irritable bowel syndrome, and back, abdominal, and pelvic pain, Finding 3, *id*. at 27; that her testimony regarding the severity of her pain, anxiety, and other limitations was not well-supported by the medical evidence prior to August 2003 and was not considered credible prior to that time to the extent of establishing an inability to work, Finding 5, *id*.; that from June 1, 2001, through at least December 31, 2001 (and up to August 2003), she retained the mental residual functional capacity ("RFC") to perform at least unskilled work, as she could understand, remember, and carry out simple job instructions, could relate appropriately to others in workplaces that were not highly stressful, and could sustain attention and concentration for simple tasks, Finding 7, *id*.; that, from January 1, 2000, through at least December 31, 2001 (and up to August 2003), she was capable of performing unskilled light and sedentary work that existed in significant numbers in the national economy, as established by Rules 202.20 and 201.27 of Appendix 2 to Subpart P, 20 C.F.R. § 404 (the "Grid") and by the testimony of a vocational expert, Finding 9, *id*.; that she was not disabled, for purposes of SSD benefits, on or before the expiration of her insured status on December 31, 2001, Finding 10, *id*.; and that, since August 20, 2003, due to her worsening anxiety, she had been unable to perform the mental demands of any substantial gainful activity and, therefore, had been disabled for purposes of Supplemental Security Income ("SSI") benefits since that date, Finding 11, *id*.[2] The Appeals Council declined to review the decision, *id*. at 7-9, making it the final determination of the

[2] Whereas entitlement to SSD benefits hinges in part on acquisition of insured status, entitlement to SSI benefits does not. *See, e.g., Splude v. Apfel*, 165 F.3d 85, 87 (1st Cir. 1999) ("In 1972, Congress added a new social security program to provide 'supplemental security income' (called 'SSI') for 'aged, blind and disabled' persons of limited means regardless of their insured status. This is a social welfare program funded out of general taxpayer revenues. SSI is available even to those who qualify for SSD, but SSD income is considered in determining whether a disabled person qualifies for SSI under the latter's means test.") (citations omitted); *Chute v. Apfel*, No. 98-417-P-C, 1999 WL 33117135, at *1 n.2 (D. Me. Nov. 22, 1999) (rec. dec., *aff'd* Dec. 20, 1999) ("To be eligible to receive SSD benefits the plaintiff had to have been disabled on or before her date last insured (March 31, 1995); however, eligibility for SSI benefits is not dependent on insured status.").

commissioner, 20 C.F.R. § 404.981; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).[3]

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. § 405(g); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential process, at which stage the burden of proof shifts to the commissioner to show that the claimant can perform work other than her past relevant work. 20 C.F.R. § 404.1520(g); *Bowen v. Yuckert*, 482 U.S. 137 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain positive evidence in support of the commissioner's findings regarding the plaintiff's residual work capacity to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

[3] The decision of which the plaintiff complains, dated September 25, 2007, *see* Record at 28, was rendered following remand from the Appeals Council, *see id.* at 40-42. The administrative law judge had rendered a partially favorable decision dated September 29, 2006, finding the plaintiff disabled as of March 1, 2004, but not prior thereto. *See id*. at 45. By letter dated November 8, 2006, the plaintiff's counsel moved for reopening and revision of that decision, submitting new evidence in the form of an October 27, 2006, report from Brian Rines, Ph.D. *See id*. at 45-46. In addition, by letter dated November 29, 2006, the plaintiff's counsel sought review by the Appeals Council, noting that the administrative law judge had not yet acted on his request for reconsideration. *See id*. at 49. By decision dated December 20, 2006, the administrative law judge acted on the request for reconsideration, reaffirming his conclusion that the plaintiff was not disabled before March 1, 2004, despite consideration of the newly submitted Rines report. *See id*. at 45-48. However, the reconsideration decision was mooted when, by decision dated February 2, 2007, the Appeals Council granted the plaintiff's request for review and vacated the September 29, 2006, decision with respect to the question of disability before March 1, 2004. *See id*. at 40-42, 613-15. Following remand, the plaintiff's counsel submitted further new evidence in the form of an August 8, 2007, opinion of a treating social worker, Loren J. Andrews, M.A., M.S.W., *see id*. at 566-68, and the administrative law judge held a new hearing on August 20, 2007, at which the plaintiff and a vocational expert both testified, *see id*. at 611-12. In his ensuing post-remand decision, which is the target of the instant appeal, the administrative law judge was persuaded to move the onset date of disability back to August 20, 2003, effectively providing SSI benefits from the earliest date for which the plaintiff was eligible for them, but continuing to deny SSD benefits. *See id*. at 26 & n.3. At oral argument, the plaintiff's counsel confirmed that only SSD benefits are at issue in the instant appeal.

## I. Discussion

The plaintiff asserts that the administrative law judge erred in (i) determining, in the absence of substantial evidence, that she was disabled no earlier than August 20, 2003, (ii) failing to apply Social Security Ruling 83-20 ("SSR 83-20") to establish the onset date of disability, and (iii) omitting to consider the effects of her agoraphobia in concluding that her failure to seek medical treatment from 2001 to 2004 evidenced a lack of severity of her mental health impairments. *See* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (Docket No. 11) at 3-12. For the reasons that follow, I recommend that the court find that reversal and remand are warranted.

### A. Backdrop: Plaintiff's History of Mental Health Treatment

The plaintiff commenced mental health treatment on January 10, 1991, at the age of 14, when her parents sent her to psychologist Sarah Davenport, Ph.D., of Mid-Coast Mental Health Center ("MCMHC") for treatment of severe agoraphobia and other anxieties. *See* Record at 535. Her symptoms included sudden attacks of diarrhea that, in themselves, caused her to fear leaving the home. *See id*. at 536-37. The plaintiff's "agoraphobia was so advanced that she rarely left the house and she absolutely refused to go to school." *Id*. at 535.

With treatment, the plaintiff regained the ability to attend school and even go on outings with friends. *See id*. During the course of treatment, she disclosed that she had been sexually abused from the age of 13. *See id*.[4] The perpetrator was prosecuted, and she became much less anxious. *See id*. Dr. Davenport's course of treatment of the plaintiff ended in July 1992. *See id*. at 534.

[4] During later treatment as an adult, the plaintiff reported that she had been sexually abused by the individual in question, whom she had met at a church group, from age 11 to 14. *See* Record at 540. The plaintiff's parents had informed Dr. Davenport in 1991 that their daughter's anxiety-related symptoms first occurred when she was in sixth grade. *See id*. at 536.

The plaintiff dropped out of high school after completing the ninth grade. *See id*. at 619. She later obtained a General Equivalency Diploma and training as a certified nurse's aide, or CNA. *See id*. at 619-20. She returned to MCMHC in August 1997, while training to become a CNA, reporting that she had been "medically worked up" for dizziness, palpitations, shortness of breath, and hyperventilation, with no underlying etiology found, and complaining that she felt like she was going to die. *See id*. at 544. Insofar as appears from the record, she did not return for additional counseling until 2001.

The plaintiff worked as a CNA from the spring of 1998 through the end of 1999. *See id*. at 620. She testified that, during that period, although she was scheduled to work 40 hours a week, she typically worked only 20 as a result of anxiety and panic attacks and a constant need to go to the bathroom. *See id*. at 634-35.

Throughout 2001, the plaintiff complained of symptoms of anxiety, panic attacks, and heart palpitations. *See id*. at 279-85, 539-40. She missed some scheduled appointments, *see id*., and was noted in March 2001 to be resistant to counseling despite reporting that she was experiencing palpitations, chest pains, and facial flushing, and having a sense of impending doom, *see id*. at 283. Nonetheless, she did return to MCMHC, where she was seen by social worker Andrews, on November 6, 2001. *See id*. at 540-43. She "described having very bad anxiety attacks[,]" said she continued to suffer from agoraphobia, although better than in the past because she was able to go out of the house on some days, and told Andrews that she was unable to hold onto jobs because of her problems with anxiety and agoraphobia. *Id*. at 540-41. Andrews assessed her with a GAF, or global assessment of functioning, score of 50 and

recommended outpatient therapy. *See id*. at 543.[5] The plaintiff was seen again at MCMHC on December 4, 2001, *see id*. at 539, but the record contains no indication of further mental-health counseling follow-up until August 9, 2004, when she again visited MCMHC, *see id*. at 532.

The plaintiff briefly worked part-time as a CNA in 2003 and 2004, but did not sustain work at a so-called "substantial gainful activity" level. *See, e.g.*, *id*. at 18. When she recontacted MCMHC in August 2004, she reported to John H. Brennan, M.D., that (i) her panic and agoraphobia were long-standing, dating back to age 11, (ii) she had tried different medications and trials of counseling with little benefit, and (iii) although she could emerge from her house for certain activities in some circumstances, she felt housebound much of the time and considered her condition "quite disabling[.]" *Id*. at 532. Dr. Brennan assessed her with a GAF score of 40. *See id*. at 533.[6]

**B. Expert Opinions of Record**

The plaintiff first applied for SSI and SSD benefits on August 20, 2003, and reapplied, after an initial denial, on June 17, 2004. *See id*. at 16-17 & n.1. In connection with her first application for benefits, Disability Determination Services ("DDS") sent her to Susanne Stiefel, Ph.D., for a consultative examination. *See id*. at 296. Dr. Stiefel met with the plaintiff on October 13, 2003, conducting a clinical examination and a mental status assessment and

[5] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) ("DSM-IV-TR"), at 32. The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. A GAF score of 41 to 50 represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. (boldface omitted).

[6] A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34 (boldface omitted).

administering a Beck Depression Inventory. *See id*. No records were provided for Dr. Stiefel's review. *See id*. Dr. Stiefel described the plaintiff, who was not then in therapy, as having "a long-standing panic and anxiety disorder since childhood" but as having worked as a CNA for six weeks as recently as April 2003, when she reportedly became too anxious to continue working. *See id*. at 301-02. Dr. Stiefel assessed her as of October 2003 with a GAF of 60. *See id*. at 301.[7]

Dr. Stiefel felt that the plaintiff could follow work rules, relate to co-workers, deal with the public, and interact with supervisors, although she might have more difficulty maintaining a pace on the job because of difficulties related to anxiety, panic, post-traumatic stress disorder, and occasional depressive symptoms. *See id*. at 300. Dr. Stiefel also assessed the plaintiff as capable of understanding, remembering, and carrying out simple job instructions. *See id*. However, she noted that the plaintiff would have difficulties demonstrating reliability, behaving in an emotionally stable manner, and relating predictably in social situations. *See id*. at 301.

The record also contains the following evidence arguably bearing on the date of the plaintiff's onset of disability:

1. A Psychiatric Review Technique Form ("PRTF") dated November 11, 2003, by non-examining DDS consultant David R. Houston, Ph.D., assessing the plaintiff as currently suffering from mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with insufficient evidence of episodes of decompensation. *See id*. at 195, 205.

[7] A GAF score in the range of 51 to 60 represents "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." DSM-IV-TR at 34 (boldface omitted).

2. A PRTF dated September 13, 2004, by non-examining DDS consultant L. Johnson, M.D., assessing the plaintiff's mental impairments as currently non-severe but finding insufficient evidence to evaluate her condition during the period before her date last insured. *See id*. at 209.

3. A PRTF dated December 17, 2004, by non-examining DDS consultant Peter G. Allen, Ph.D., assessing the plaintiff's mental impairments as currently disabling (meeting Listing 12.06) but finding insufficient evidence to evaluate her condition during the period before her date last insured. *See id*. at 231.[8]

4. The October 27, 2006, opinion of Dr. Rines, based on review of DDS consultants' reports and medical records spanning the prior 20 years, as well as evaluation of the plaintiff on two occasions in September and October 2006 and administration of an MMPI-2 psychological test, that she had a mental impairment meeting or equaling Listing 12.06, with elements of somatoform disorder, Listing 12.07. *See id*. at 255-57, 562. Dr. Rines concluded that the plaintiff "was impaired to any sustained work activities on December 31, 2001 and very likely some months before that[.]" *Id*. at 22.[9]

5. The August 8, 2007, opinion of social worker Andrews that (i) the plaintiff suffered from three distinct difficulties, all in the realm of anxiety disorders, namely, panic disorder with agoraphobia, generalized anxiety disorder, and obsessive-compulsive disorder,

---

[8] If a claimant's impairment or combination of impairments meets or equals the specific criteria of impairments listed in Appendix 1 to Subpart P, 20 C.F.R. § 404 (the "Listings"), he or she is deemed disabled. *See, e.g., Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) ("If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience."). Listing 12.06 pertains to anxiety-related disorders.

[9] I am unable to locate this retrospective opinion in Dr. Rines' report. However, the plaintiff represents that Dr. Rines expressed it, and the administrative law judge quotes it in his decision. *See* Statement of Errors at 2; Record at 22. At oral argument, counsel for the commissioner did not contest that this portion of the Rines report had been inadvertently omitted from the record.

(ii) she had suffered from these difficulties "for the bulk of her adult life, and perhaps extending back into childhood[,]" and (iii) these challenges "make it impossible . . for her to obtain and maintain any kind of employment at this time." *Id*. at 566. Andrews added, in an accompanying RFC assessment in which he indicated that the plaintiff's mental impairments markedly limited her in, or effectively precluded her from, many work-related activities: "Based on my education, training and experience and my evaluation of [the plaintiff,] including interviews with her, history and review of her records, the foregoing represents my professional opinion as to [her] psychological limitations from 12/31/01 to the present." *Id*. at 568.

The administrative law judge rejected the retrospective opinion of Dr. Rines on the bases that Dr. Rines did not see or evaluate the plaintiff until September and October 2006 and, to the extent that he spoke to her condition as of 2001, the opinions of DDS consultants, who were experienced in evaluating Social Security disability claims and who examined the plaintiff or reviewed her records closer to the relevant time, were entitled to greater weight. *See id*. at 24.

He rejected the Andrews opinion on the basis that Andrews had seen the plaintiff for only a few weeks and that his opinion did not even purport to judge her condition as of her date last insured, given that he opined only that she could not work "at this time." *Id*.

The administrative law judge further noted that "[t]he fact that the [plaintiff] received very little mental health treatment from her alleged onset date of January 1, 2000 until August 2004 weighs against a conclusion that she was unable to work during that time." *Id*. at 23. He determined that the evidence of record did not appear to demonstrate an inability to function in the workplace prior to August 2004, and particularly between June and December 2001. *See id*. at 23-24. For example, he stated that, in October 2003, Dr. Stiefel assessed the plaintiff with a

GAF score of 60 and considered her able to perform the mental demands of work, mentioning only the possibilities of difficulty maintaining pace and attendance. *See id*. at 23-24.

I agree with the plaintiff that the administrative law judge's finding that she was not disabled prior to August 20, 2003, the date of her initial application for benefits, is not supported by substantial evidence. None of the DDS consultants stated that the plaintiff's mental impairments were non-disabling as of December 31, 2001, her date last insured. Neither Drs. Stiefel nor Houston purported to address her work capacity as of that time period, *see id*. at 195, 300-01, although Dr. Stiefel did point out that her panic and anxiety disorders were long-standing since childhood, *see id*. at 301. Drs. Johnson and Allen indicated that they had insufficient evidence to address that time period. *See id*. at 209, 231. Further, Dr. Johnson references none of the 2001 records reflecting the plaintiff's contemporaneous mental health complaints, and Dr. Allen references only a December 2001 note, raising doubt whether either consultant had the benefit of the full panoply of those records. *See id*. at 221, 243.

The only two expert opinions of record bearing on the plaintiff's date of onset of disability are those of Dr. Rines and social worker Andrews. As the plaintiff suggests, *see* Statement of Errors at 10, the administrative law judge's predicates for rejecting the Andrews opinion cannot withstand scrutiny. Andrews did in fact treat the plaintiff, albeit briefly, prior to the expiration of her date last insured, and he made clear that his 2007 opinion encompassed her state in December 2001 as well as in August 2007. *Compare id*. at 24 *with id*. at 540-43, 566-68. In any event, in rejecting both the Rines and Andrews opinion, the administrative law judge arrived at a disability onset date opinion unsupported by any medical expert opinion of record.[10]

[10] At oral argument, counsel for the commissioner contended that any error in evaluating the Andrews opinion was harmless because (i) Andrews, a social worker, is not an "acceptable medical source" as defined in 20 C.F.R. § 404.1513(a), as a result of which his opinion is entitled to less weight, and, (ii) in any event, the medical evidence *(continued on next page)*

**C. Other Bases for Decision as to Onset of Disability**

In the absence of reliance on any such expert opinion, the administrative law judge relied on the drawing of a negative credibility inference based on the plaintiff's sporadic mental health treatment, coupled with an assessment that the raw medical evidence did not denote the existence of impairments of disabling severity prior to August 2004 and particularly during the period between June and December 2001. *See id*. at 23-24. In the circumstances of this case, these observations do not supply an adequate basis for his finding as to date of disability onset.

As the plaintiff points out, *see* Statement of Errors at 11-12, Social Security Ruling 96-7p provides: "[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Social Security Ruling 96-7p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2009) ("SSR 96-7p"), at 140.

In drawing a negative inference against the plaintiff based on her sporadic mental-health treatment, the administrative law judge did not address her explanation, for which there appears

of record, including that available for 2001, does not support Andrews' opinion that the plaintiff suffered from impairments of a disabling level of severity in 2001. For two reasons, this argument falls short of salvaging the handling of the Andrews opinion or the decision generally. First, it amounts to a *post hoc* rationalization for agency action, inviting the court to uphold the decision on bases other than those supplied by the administrative law judge. *See* Record at 24; *see also Federal Power Comm'n v. Texaco Inc.,* 417 U.S. 380, 397 (1974) ("[W]e cannot accept appellate counsel's *post hoc* rationalizations for agency action; for an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself.") (citations and internal quotation marks omitted); *Cagle v. Astrue*, 266 Fed. Appx. 788, 794 (10th Cir. 2008) (rejecting commissioner's "impermissible attempt to provide a *post hoc* rationale in support of the ALJ's decision"). Second, even assuming *arguendo* that the administrative law judge *could have* properly rejected the Andrews opinion, that does not salvage the decision overall. The Andrews and Rines opinions were the only expert opinions of record addressing the plaintiff's date of onset of disability. In rejecting them, the administrative law judge proceeded to assess that date on the basis of the raw medical evidence of record. For reasons discussed below, he erred in so doing.

to be some support of record, that she tended to avoid or cancel scheduled appointments because of her agoraphobia. *See* Record at 629-31; *see also id*. at 529.

Finally, in parsing the raw medical evidence, while the administrative law judge correctly noted that Dr. Stiefel assessed the plaintiff in October 2003 as having a GAF of 60 and some work capacity, he omitted to mention that Andrews assessed the plaintiff in November 2001 with a GAF of 50, reflecting serious impairment. *Compare id*. at 23-24 *with id*. at 543. These conflicts, viewed against the backdrop of the record evidence as a whole, raise a serious question whether the evidence was ambiguous as to onset date. The administrative law judge should have considered that question and, if he answered it in the affirmative, enlisted the services of a medical advisor concerning the date of onset of disability. *See, e.g., Katt v. Astrue*, No. 05-55043, 2007 WL 815418, at *1 (9th Cir. Mar. 14, 2007) ("[A]n ALJ must call a medical expert if there is ambiguity in the record regarding the onset date of a claimant's disability. If the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination.") (citation and internal quotation marks omitted).

His failure to do so, coupled with his flawed handling of the Andrews opinion and his failure to consider the plaintiff's explanation for her sporadic mental health treatment, warrant reversal and remand.

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be ***VACATED*** and the case ***REMANDED*** for further proceedings consistent herewith.

## ***NOTICE***

***A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.***

***Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.***

Dated this 30th day of December, 2009.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge